634 A.2d 48

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Richard Allen JAMES.

Misc. Docket (Subtitle BV) No. 21, Sept. Term, 1992.

Court of Appeals of Maryland.

Dec. 13, 1993.

Melvin Hirshman, Bar Counsel, and Glenn M. Grossman, Asst. Bar Counsel for the Attorney Grievance Com'n of Md.

Ralph W. Powers, Jr., Upper Marlboro, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

RODOWSKY, Judge.

This disciplinary complaint against the respondent, Richard Allen James (James), was referred for hearing to Judge Graydon S. McKee, III of the Circuit Court for Prince George's County. Judge McKee has concluded that James engaged in conduct involving dishonesty, deceit, fraud and misrepresentation, in violation of Rule 8.4(c) of the Maryland Rules of Professional Conduct. That conclusion is based on the fact that James "signed his name along with the name of [the Division of] Parole and Probation on a check made out to Parole and Probation and [James] deposited the check into [his] escrow account without permission from Parole and Probation." That same fact underlies a conclusion that James also engaged in conduct prejudicial to the administration of justice in violation of Rule 8.4(d). Judge McKee further found that James violated Rule 1.5(c) "by failing to communicate the terms of a contingent fee agreement in writing." Set forth below are the rather unusual facts out of which these violations arose.

James was admitted to the Bar of this Court in 1971. His office is in Greenbelt. In the early 1980s he began representing Andrea Lockett (Lockett), the owner of a landscaping and irrigation business, by collecting accounts and by defending customers' claims. In March 1988, Lockett became aware that one of her employees, Mary Jannette Seibly (Seibly), was embezzling from her. Lockett reported the matter to the Anne Arundel County police, and she also consulted James. James filed a civil action on Lockett's behalf against Seibly in the Circuit Court for Anne Arundel County in April 1988. Seibly was indicted on nine counts of forgery, nine counts of uttering, and one count of theft in May 1988.

When James undertook the Seibly matter he was also pursuing one account collection for Lockett and defending her in one other case. Lockett paid James $1,200 as a deposit toward fees on all three of these matters. James did not furnish Lockett with any written disclosure of the fee arrangement on the Seibly matter.

Seibly's attorney in the criminal prosecution and as defendant in Lockett's civil action was Don F. Lindner (Lindner). Lindner negotiated a plea bargain with the Assistant State's Attorney, Frederick M. Paone (Paone), which was accepted by Judge Bruce C. Williams. Prior to sentencing in the criminal case, Seibly had made partial restitution directly to Lockett through two payments of $5,000 each. On February 15, 1989, Judge Williams placed Seibly on three years probation, one condition of which was that restitution of the balance owed to Lockett, an additional $10,000, be made within nine months.

Seibly, as a probationer, was assigned to senior agent Carolyn Fidgeon (Fidgeon) of the Annapolis office of the Division of Parole and Probation. A statute requires that restitution payments be made to the Division of Parole and Probation. Md.Code (1957, 1992 Repl.Vol.), Art. 27, § 640. Fidgeon routinely would have advised Seibly of this requirement.

Seibly had not made any additional restitution payments by September 1989, but she had a job opportunity in California

that would double her income. Fidgeon obtained the sentencing court's permission for Seibly to move to California, and Seibly did so. Seibly, however, did not make restitution by the due date of November 15, 1989. At the end of November Fidgeon charged Seibly with violation of probation, and a bench warrant was issued February 1, 1990.

Into the spring of 1990 Seibly had not contacted her probation agent or her attorney. Then, Lindner received from Seibly a cashier's check issued by a California savings and loan association dated May 15, 1990, in the amount of $10,405 and payable to "Division of Parole & Probation Md." Lindner hand delivered that check to James in the Anne Arundel County courthouse in Annapolis during a chance encounter on May 22, 1990.

James testified before Judge McKee that he and Lindner discussed that Parole and Probation would not accept a payment that was not in the form of a certified check or money order, and that "[t]here was no other reason for Mr. Lindner to give me the check." Lindner did not testify in Bar Counsel's case in chief. When called by Bar Counsel for very brief rebuttal testimony, Lindner was asked if he had ever told James that Parole and Probation would not accept the Seibly check as it was presented, and Lindner replied, "No, sir, not to my knowledge." Judge McKee did not resolve this factual conflict.[1]

---

1. Judge McKee included the following statement in his report to this Court:

 "Mr. James has contended that he was concerned that Parole and Probation would not cash a cashier's check as opposed to a certified check. The Court finds this contention without merit."

 We do not interpret this passage as resolving the factual conflict or as rejecting James's testimony that he was concerned that Parole and Probation might send the instrument back to Seibly in California with the request, which might or might not be honored, that Seibly resubmit the funds by a different form of instrument. Rather, we interpret Judge McKee's statement to mean that James's concern did not constitute legal justification or excuse for the unauthorized endorsement of the cashier's check.

James also testified that he did not focus on the amount of the check, but simply treated it as the balance of the restitution due to Lockett. In point of fact, $205 of the $10,405 represented reimbursement of court costs in the criminal cause, and $200 represented a two percent collection fee which Parole and Probation is authorized to charge "for administrative costs of collecting payments or property." Art. 27, § 640(d)(4).

After delivering the check to James, Lindner, by letter of May 25, 1990, with copies to Paone and to James, wrote to Judge Williams advising that Lindner had "received a certified check for the entire amount of restitution," and that the "check was promptly given to the complaining witness[']s attorney, Richard James." Lindner requested that the outstanding bench warrant be quashed and that the violation of probation charge be dismissed. At the same time Lindner wrote only to James requesting that the civil action against Seibly be dismissed. The second paragraph of that letter reads:

"I trust that you have been successful in endorsing the check and providing the proceeds due to your client to her."

On May 31 Paone, with copies to Lindner and James, wrote to Judge Williams confirming the State's lack of objection to striking the warrant.

On the evening of the day that he received the check from Lindner, James so advised his client by telephone. Lockett, who was under the impression that Seibly had fled, considered the recovery to be found money. Lockett testified that James proposed a fee of "between like twenty and thirty percent." That was "fine" with Lockett.

At the opening of business at the Annapolis office of Parole and Probation on May 23, 1990, James appeared with the check. Agent Fidgeon was on extended sick leave, and James spoke with Field Supervisor–I Patricia Vale (Vale). Vale testified that James wanted to deposit the check in his escrow account and to pay his client, the victim in the case, but James did not know the probationer's name. Vale said she advised

that she could not endorse the check but that, if the probationer's name and account number were known and furnished to Fidgeon, the check could be sent to the Division Central Collection Unit in Baltimore. Vale further testified:

"I told [James] that the checks are suppose[d] to be certified checks or money orders; however, that I knew that on other occasions they had accepted other types of checks and that when we identify the probationer's name, we could call Central Collection and find out if indeed this check would be acceptable."

Vale acknowledged that personal checks had been returned to probationers because they had not been certified. When asked if it was correct that the Division's policy was that payments be by certified check or money order, Vale replied, "[T]hat is the written policy."

Vale made a copy of the face of the check which James took with him, and Vale wrote a note for Fidgeon describing the events.

Later that day James went to his bank in Greenbelt where he endorsed the check, "Division of Parole & Probation Md–Pay to escrow account of Richard A. James Attorney Acc # 58–1070–7." James subscribed that endorsement by what he admitted is his signature. Also on May 23 James wrote to Lockett advising her that "$10,400" [sic] had been deposited into his escrow account, that the check was "not certified," and that disbursement would be made after the check cleared.

Later in May Lockett obtained a check from James for $7,700, representing her net recovery from Seibly. The record is silent as to the precise calculation of this net amount. James testified that he had advanced the court costs and the fee of a private process server in the civil action against Seibly.

Fidgeon first saw Vale's note to her on May 29. After two unsuccessful attempts in June to reach James, Fidgeon spoke with James by telephone on July 6, 1990. Fidgeon's memorandum of that conversation records James as saying that Vale had either endorsed the check from Seibly or authorized

James to endorse it. Fidgeon denied that that was possible, and the conversation became heated. Fidgeon also pointed out that $405 of the check's face amount was not restitution payable to Lockett.

Thereafter Fidgeon, throughout July 1990, made a number of telephone calls to Lockett, Lindner, Paone, Judge Williams's chambers, and the California savings and loan, from which she obtained a copy of the face and reverse sides of the $10,405 cashier's check.

Immediately following his July 6 telephone conversation with Fidgeon, James wrote to Lindner, with copies to Fidgeon, to Lockett, and to Paone, remitting $405 by James's check. James proposed that Lindner return the funds to Seibly or to Parole and Probation, "whichever you feel is proper." The parties seem implicitly to accept that Parole and Probation ultimately received the $405.

James testified that, later in July, he received a telephone call from Paone. As a result of that conversation James, on July 20, 1990, remitted $2,500 to Lockett, describing the payment as the "fee deducted from the" $10,000 payment. James's covering note indicated that the fee would be billed later. James, who previously has been suspended for two years by this Court, *Attorney Grievance Comm'n v. James,* 300 Md. 297, 477 A.2d 1185 (1984), testified that he "did not want to give the appearance of any impropriety," so that he never billed further on the Seibly matter.

Lockett testified that James never charged her any additional fee for the other two matters that he was handling for her at the time he undertook to recover from Seibly. One of those cases was settled out of court, and one of them was tried. Thus, James had remitted $7,700 and $2,500 to Lockett and $405 to Lindner, or $200 in excess of the $10,405 deposited to his escrow account, and James had not been reimbursed for cash advances. James's gross fee for the three Lockett matters, including the Seibly matter, unadjusted for the foregoing net loss, was the $1,200 paid in March 1988.

James's sole exception concerns the admissibility of the testimony of a witness from the Central Collection Unit. Over objection by James, the witness testified that in 1990 Parole and Probation would accept cashier's checks in payment of restitution. James argues that this evidence was irrelevant, contending that only what he thought the Parole and Probation policy to be could be relevant. The exception is overruled. From the standpoint of James's state of mind, the testimony tends to make it more likely that Vale, in fact, told James, as Vale testified, that the Central Collection Unit sometimes accepted instruments that did not comply strictly with Parole and Probation's written policy. Further, we do not agree with James's premise that he had no duty to inquire further, after talking with Vale. The testimony objected to reflects what James would have learned had he presented the cashier's check, together with the name of the probationer, to Parole and Probation.

We turn then to the question of sanction. That involves an evaluation of the seriousness of the infractions. With respect to Rule 1.5(c), James does not dispute that the fee on the Seibly matter was, at least in part, contingent and that the terms of that fee agreement were not communicated to the client in writing at the time of the legal employment. Lockett did not receive a written disclosure reflecting the amount or percentage of the contingent fee or reflecting the relationship of the $1,200 retainer to the total, potential fee on the Seibly matter. On the other hand, Lockett suffered no loss, is satisfied with James's services, and, indeed, appears to have come out more than whole. Further, it was prior to any contact by Bar Counsel with James on this matter that James remitted the entire recovery from Seibly (and more) to his client.

With respect to James's unauthorized endorsement of the cashier's check, the record reflects facts sufficient to support finding all of the elements of forgery of an endorsement of a bill of exchange.

Article 27, § 44(a) provides, in relevant part:

"Any person who shall ... forge ... any ... bill of exchange ... [or] endorsement ... of any ... bill of exchange ... with intention to defraud any person whomsoever, shall be deemed a felon, and upon conviction, shall be sentenced to imprisonment for not more than 10 years or fined not more than $1,000 or both."

Forgery in Maryland "is comprised of essentially three elements. First, there must be a writing which is the proper subject of forgery. Secondly, this writing must be false. Finally, the writing must have been rendered false with intent to defraud." *State v. Reese*, 283 Md. 86, 90, 388 A.2d 122, 125 (1978).

■ A check is a bill of exchange and may be the subject of a forgery. *See, e.g., Hawthorn v. State*, 56 Md. 530 (1881). Second, the check James presented for deposit at his bank was a false writing. According to Professor Perkins, one of the three most common ways of making a false writing is "placing the name of another on the back of a genuine instrument so that it appears to be his indorsement thereof," without the authority to do so. R. Perkins, *Perkins on Criminal Law* 346 (2d ed. 1969).

■ As to the third element, intent to defraud, there need not be an identified victim who suffered a pecuniary loss. *Reddick v. State*, 219 Md. 95, 99, 148 A.2d 384, 386 (1959); *Arnold v. Cost*, 3 G. & J. 219, 231 (1831). Circumvention of the statutory scheme for the payment of restitution through Parole and Probation by the unauthorized signing of another's name appears to be sufficient to permit finding an "intent to defraud" the State. For the same reason the unauthorized signing of the name of a licensed physician on a prescription for narcotics permits finding an "intent to defraud" the sovereign. The forgery element of statutory crimes proscribing the latter conduct is met because the writing is intended to frustrate the sovereign's scheme for control of those substances, *French v. United States*, 232 F.2d 736, 739 (5th Cir.1956); *United States v. Hall*, 58 F.Supp. 772, 773 (E.D.N.Y.1944), even if the accused intended to pay to the

licensed seller the full price for the prescription drugs, *People v. Merchant,* 5 Ill.App.3d 636, 638, 283 N.E.2d 724, 725 (1972).

James knew of the statutory scheme requiring restitution checks to be processed and disbursed by Parole and Probation, and he used deception to circumvent this procedure. By placing Parole and Probation's endorsement on the check without authority, James represented to his own depositary bank, to the drawee bank, and to any other holders in the chain of transfer that the payee had consented to his possession of the check and of the funds it represented. That he did so in order to obtain immediate possession of the funds appears to satisfy the third element of forgery.

■ Nevertheless, in the total transaction the only monetary loss to a participant other than James seems to be the interest lost by the State of Maryland on $405 that was not paid as early as it otherwise might have been. Further, although one purpose of Art. 27, § 640 is to have an impartial monitor and recordkeeper, Parole and Probation, advise the court whether restitution has been made in full or the condition of probation violated, in this case Lindner advised the court that Seibly had paid in full. This information was confirmed by James, without objection by the prosecutor.

James's motive for misrepresenting the endorsement is also significant in determining an appropriate sanction. Judge McKee said flatly, "It is the finding of this Court that Mr. James felt that he was acting in the best interest of his client when he deposited the check into his escrow account." This finding, which is unchallenged by Bar Counsel, negates any inference that James, with some initial cooperation from Lindner, was primarily interested in controlling and disbursing the restitution in order to be able to deduct a fee from the funds, as opposed to billing the client for a fee after funds had been disbursed to her by Parole and Probation.

Other significant factors bearing on the sanction are James's prior violations, and the fact that one of them involved misrepresentation. *See James,* 300 Md. at 298–306, 477 A.2d at 1186–89. James had negotiated a $1,250 settlement to be

paid in installments by his client, and James had agreed to apply the payments first wholly to the settlement and thereafter to his fee. *Id.* at 299–300, 477 A.2d at 1186. James applied the first payments to his fee and then misrepresented to his client and to a court what he had done. *Id.* at 300, 477 A.2d at 1186–87. We suspended James for two years, thereby imposing the same discipline as had the Court of Appeals for the District of Columbia on the same charges. *Id.* at 305, 477 A.2d at 1189.

Under Judge McKee's findings, however, the instant matter does not involve misrepresentation for personal gain as did the previously reported disciplinary proceeding.

Primarily because of the prior suspension, Bar Counsel recommends that James be disbarred for the current violations. Comparison to somewhat analogous cases, however, demonstrates that disbarment would be quite disproportionate. In *Attorney Grievance Comm'n v. Sperling,* 296 Md. 558, 560–63, 463 A.2d 868, 869–70 (1983), the attorney failed to correct the record at a deposition when the attorney knew that his client had testified inaccurately on a matter of very little relevance. We imposed a reprimand. *Id.* at 566, 463 A.2d at 871. In another case we suspended an attorney for thirty days for misrepresentation. That attorney had written a letter to the Department of Social Services to assist the client in obtaining welfare payments, but the attorney failed to disclose that approximately $3,400 then stood to the client's credit in the attorney's escrow account. *Attorney Grievance Comm'n v. Hall,* 298 Md. 230, 231–32, 468 A.2d 347, 348 (1983). The lawyer in *Attorney Grievance Comm'n v. Babbitt,* 300 Md. 637, 479 A.2d 1372 (1984), was suspended for sixty days for misrepresentation. That attorney had forged a use and occupancy permit in order to close, as builder and developer, on the sale of a residence to buyers who would have lost an advantageous purchase money loan commitment if the closing had been delayed. *Id.* at 639–40, 479 A.2d at 1374.

*Attorney Grievance Comm'n v. Maxwell,* 307 Md. 600, 602–03, 516 A.2d 570, 571 (1986), involved misrepresentations in a

deed posted as collateral for two bail bonds in the principal amounts of $500,000 each. Maxwell represented the two persons who were released on bail. He had also represented, in the acquisition of the realty, the three stockholders of the corporation in which the realty was titled. *Id.* at 601–02, 516 A.2d at 570. One of these owners, using a fictitious name, executed the deed on behalf of the grantor corporation, and Maxwell, as a notary public, certified that the fictitious person had executed the deed. *Id.* at 602–03, 516 A.2d at 571. We pointed out that the deceit was not self-serving. *Id.* at 603, 516 A.2d at 571. But we also pointed out that "Maxwell's falsification of the deed might have led to substantial harm had [the persons released on bail] failed to appear." *Id.* at 604, 516 A.2d at 572. Maxwell had no other violations in thirty years of practice. We suspended him for ninety days. *Id.* at 605, 516 A.2d at 572.

Because the instant matter is the second violation by James involving misrepresentation, the Court, a majority of the judges concurring, suspends James for one year. The suspension shall commence thirty days from the date of the filing of the opinion in this case. Prior to termination of the suspension, James shall pay all costs of the disciplinary proceedings.

Judges Eldridge, Rodowsky, and Chasanow, mindful of the prior violation, but believing the current violation to be less serious than that in *Maxwell,* would suspend for ninety days.

IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE BV15 c FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST RICHARD ALLEN JAMES.